UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICKEY A. MACKEY, BALDEMAR, | § | |
| MERCADO and GOLDIE BYRD | § | |
|     Plaintiffs, | § | |
| | § | Civil Action No. |
| vs. | § | |
| | § | |
| FLUOR INTERCONTINENTAL, INC. | § | |
|     Defendant. | § | JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

1.     Rickey A. Mackey, Baldemar Mercado, and Goldie Byrd ("Plaintiffs") bring this action against Defendant Fluor Intercontinental, Inc. ("Fluor") for unlawful retaliation in violation of the whistle-blower protection provisions of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h).  Plaintiffs seek relief for losses sustained as a result of Fluor's threats, harassment, discrimination, retaliation, and termination of employment.

## I.
## Parties

2.     Rickey A. Mackey ("Mackey") is a citizen of the State of Texas.  He resides in Killeen, Texas.  At all times relevant to this action, he was an "employee" of Fluor for purposes of the False Claims Act, 31 U.S.C. § 3730(h).

3.     Baldemar Mercado ("Mercado") is a citizen of the State of Texas.  He resides in Rosenberg, Texas.   At all times relevant to this action, he was an "employee" of Fluor for purposes of the False Claims Act, 31 U.S.C. § 3730(h).

4.     Goldie Byrd ("Byrd") is a citizen of the State of Kentucky.  She resides in Somerset, Kentucky.  At all times relevant to this action, she was an "employee" of Fluor for purposes of the False Claims Act, 31 U.S.C. § 3730(h).

5.      Defendant Fluor Intercontinental, Inc. ("Fluor" or "Defendant"), is a California corporation that is headquartered and does business at 6700 Las Colinas Blvd., Irving, Texas, 75039 and may be served through its registered agent at Corporation Service Company d/b/a CSC  - Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.  At all times relevant to this action, Fluor was an "employer" for purposes of the False Claims Act, 31 U.S.C. § 3730(h).

## II.
## Jurisdiction and Venue

6.      This court has jurisdiction over the subject matter of this complaint under 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.SC. § 3730(h).  This court also has jurisdiction over the subject matter of this complaint under 28 U.S.C. § 1332 because this is an action between citizens of different states in which the matter in controversy exceeds $75,000.00

7.      Venue in this judicial district is proper pursuant to 31 U.S.C. § 3732(a) because Defendant can be found and has and continues to actively transact business in this judicial district.

## III.
## Facts and Allegations

### A. The LOGCAP IV Contract

8.      The United States Army's Logistics Civil Augmentation Program ("LOGCAP") was established by the U.S. Army on December 6, 1985, as an initiative to manage the use of civilian contractors who perform services in support of Department of Defense ("DOD") missions during times of war and other military mobilizations in the military theatres of Iraq and

Afghanistan.  Logistical support services include: (i) supply operations such as food, water, fuel, and spare parts; (ii) field operations such as food, laundry, housing, sanitation, waste management, postal services, welfare and recreation; and, (iii) other operations such as transportation and cargo services, engineering and construction, and communication network support.

9.      On April 18, 2008, the DOD awarded the fourth generation of support contracts, LOGCAP IV, to three contractors which are to compete for task orders: Fluor Intercontinental, Inc. (õFluorö), KBR, Inc. (õKBRö), and DynCorp International L.L.C. (õDynCorpö). Essentially, through the use of multiple contractors (as opposed to previous generations of LOGCAP which had a sole contractor), task orders would be awarded based on the best value and cost, after an open competition among the contractors, as determined by the Army Sustainment Command (õASCö), which serves as the logistics integrator for the contracting needs of the military worldwide, and by the Defense Contract Management Agency (õDCMAö).

10.      On September 25, 2008, the ASC awarded the first task order to Fluor in order to provide logistical support services in Afghanistan to the United States of America (õUSAö) and coalition force personnel in the field.  As part of this task order, Fluor was entrusted with the management of millions of dollars worth of U.S. Government property.  This suit arises as a result of Plaintiffsø reporting Fluorøs intentional and systematic failures to comply with Federal Acquisition Regulations (õFARö) and gross abuse of the Lost, Theft, Damaged, or Destroyed (õLTDDö) reporting process in order to avoid liability for unaccounted for and grossly mismanaged Government property.  Rather than addressing the serious violations of Government regulations reported by Plaintiffs, Fluor retaliated against Plaintiffs with threats, harassment, discrimination, and, ultimately, termination of their employment.

**B. Federal Acquisition Regulations ("FAR")**

11.     The regulations governing a contractor's obligations with regard to Government property are contained in the Federal Acquisition Regulations, codified in Title 48 of the Code of Federal Regulations.  Title to all property held by Fluor in the Afghanistan Theatre was retained by and vested in the United States Government.[1]

12.     Fluor is required, upon receipt of Government property, to promptly:  (1) document receipt of the property; (2) record the information necessary to meet the Government's recording requirements; and (3) mark the property so as to identify it as Government property.[2]

13.     Fluor's property control records constituted the Government's official property records. Official Government property records must identify all Government property and provide a complete, current, and auditable record of all transactions.[3]  Fluor was required to create and maintain records of all Government property.  The property records must identify all Government property and provide a complete, current, and auditable record of all transactions.[4]

14.     Fluor is required, upon receipt of Government property, to promptly (1) identify the property in accordance with agency regulations; (2) mark the property (items deemed to be Property Book assets) so as to identify it as Government property; and (3) record the property in its property control records.[5]

15.     Fluor is required to have a process to enable the prompt recognition, investigation, disclosure, and reporting of loss of Government property, investigate and report to the Government all cases of loss, damage, or destruction to Government property in its possession

---

[1] 48 CFR § 52.245-1(e) (also referred to as FAR 52.245-1(e)).
[2] 48 CFR § 52.245-1(f)(1)(ii).
[3] 48 CFR § 52.245-1(f)(1)(iii)45.505(a).
[4] 48 CFR § 52.245-1(f)(1)(iii)(A).
[5] 48 CFR § 45.506 (a).

4

and control as soon as the facts become known.[6]  Moreover, Fluor is required to investigate and report to the Government all incidents of property loss as soon as the facts become known.[7] Further, Fluor is required to periodically perform inventories of Government property and to record and disclose the physical inventory results.[8]

16.     Fluor is required to establish and maintain a system to control, protect, preserve, and maintain all Government property, and to maintain and make available property control records and account for all Government property in its possession.[9]  Under this provision, when unrecorded Government property is found, Fluor is required to advise the Government of both the cause of the discrepancy and actions taken or needed to prevent recurrence of same.

17.     Fluor is required to periodically physically inventory all Government property in its possession or under its control, and to submit to the Government promptly after completing such inventory:  (a) a listing that identifies all discrepancies disclosed by a physical inventory, and (b) a signed statement that physical inventory or all or certain classes of Government property was completed on a given date and that the official property records were found to be in agreement except for the discrepancies reported.[10]

18.     Fluor is responsible for the loss of any Government property in its possession that resulted from willful misconduct or lack of good faith on the part of its managerial personnel, or that resulted from Fluor's failure, due to willful misconduct or lack of good faith on the part of its managerial personnel, to establish and administer a program or system for the control, use, protection, preservation, maintenance, and repair of Government property.[11]  Fluor may also be

---

[6] 48 CFR § 52.245-1(f)(1)(vii),45.504.
[7] 48 CFR § 52.245-1(f)(1)(vii)(B) ("Unless otherwise directed by the Property Administrator, the Contractor shall investigate and report to the Government all incidents of property loss as soon as the facts become known.")
[8] 48 CFR § 52.245-1(f)(1)(vi).
[9] 48 CFR § 45.502.
[10] 48 CFR § 45.508.
[11] 48 CFR § 52.245-5,1(h)(1)(ii).

responsible for the cost of lost property if the Government determines that Fluor's property management practices were inadequate, and/or presented an undue risk to the Government, and the Contractor failed to take timely corrective action.[12]  In order to determine responsibility for such losses, Fluor is required to strictly comply with the Loss, Theft, Damaged, Destroyed ("LTDD") Reporting obligations.

### C. Loss, Theft, Damaged, Destroyed ("LTDD") Reporting Obligations

19.     The LTDD process is designed to facilitate the determination of cost assignment for lost, stolen, damaged, and destroyed Government property.[13] It allows contractors to submit instances of lost, stolen, damaged, or destroyed property to the Government, which may then task the Property Administrator in theatre to investigate the report in order to determine contractor liability.  If the contractor is liable, the contractor must repay the Government for the damages.  If the contractor is not liable, the case may be closed.  Cases submitted by LTDD reporting can only be closed when there is a determination that the contractor is not liable for the lost, stolen, damaged, or destroyed property, or when the contractor has paid the total assessed liability amount.

### D. Plaintiffs Rickey A. Mackey, Baldemar Mercado, and Goldie Byrd.

20.     Plaintiffs Rickey A. Mackey, Baldemar Mercado, and Goldie Byrd were each stationed at Bagram, Afghanistan during the period of 2012–2014[14], working in Fluor's Property Department.  In the course of their employment, Plaintiffs discovered and refused to participate in a scheme to manipulate Fluor's property reports.  The scheme was perpetrated by Fluor, its employees, and management for the purpose of concealing and covering up lost property that the

---

[12] 48 CFR § 45.105 and 245-1(h)(1)(iii).
[13] 48 CFR § 45.105 and 245-1(h)(1)(iii).
[14] Mercado and Byrd were there even longer, from 2011-2014.

Government entrusted to Fluor.  Government regulations required Fluor to maintain accurate property records and report all losses in LTDD reports.  Plaintiffs discovered that, despite massive losses of government property, Fluor was manipulating the LTDD reports to reflect no losses.  When Plaintiffs attempted to report these abuses, Fluor retaliated against Mackey, Mercado, and Byrd with threats, harassment, discrimination and, ultimately, termination of their employment.

**1. Rickey A. Mackey**

21.    Plaintiff, Rickey A. Mackey, has nearly forty years of property management experience while employed at some of the most respected institutions and corporations in the world including the U.S. Army, Lockheed Martin, EPS Corporation ("EPS"), Technical and Management Services Corporation ("TAMSCO"), and Kellogg Brown & Root Services ("KBR").  Mackey has performed his duties managing property throughout the world, in locations such as Germany, Rwanda, Croatia, Bosnia, Kosovo, Macedonia, Greece, Iraq, Kuwait, and Afghanistan.

22.    Mackey served in the military as a Supply Sergeant, responsible for maintaining hand receipts, conducting inventories and reporting loss, damage, and or destruction of materials. In the course of his career, Mackey has achieved numerous certifications, including:

- Certified Professional Property Specialist ("CPPS");

- Certified Professional Property Administrator ("CPPA"); and

- Certified Professional Property Manager ("CPPM").

23.    Mackey began working for Fluor in May of 2009 in Afghanistan, and, while at Fluor, he helped establish, enhance, and maintain, hand receipts, and local property policies and

procedures, in order to keep accurate accountability of the Government's property throughout the LOGCAP IV Afghanistan Southern region.

24.     In August 2010, Mackey relocated to Houston, Texas to work for Fluor as Material Senior Specialist and Client Property Principal Specialist, establishing property control procedures for the Houston Support Office Operation in support of the LOGCAP operation in Afghanistan, which helped to ensure accountability over the Government's property throughout Afghanistan.

25.     In January 2012, Mackey transferred back to Afghanistan as Theatre Property Manager, where he was tasked to evaluate, monitor, enhance, and correct established comprehensive property control procedures for the region in order to keep accurate accountability of the Government property throughout Afghanistan.

26.     In February 2012, Mackey began to express concern to his superiors over Fluor's property loss reporting.  Mackey informed the Materials Directors, Tony Montalvo ("Montalvo") (stateside), and Jarrold Reeves ("Reeves") (in Theatre), that there were clear deviations from well-established federal regulations and Fluor's own protocol.

27.     The Federal Acquisitions Regulations, as well as Fluor's written procedures, require that when instances of lost, damaged or destroyed assets are discovered, an LTDD must be initiated to report the loss of property.  In the course of his duties monitoring property accountability, Mackey discovered that the Bagram Materials Department was not reporting lost property as required.   Mackey was particularly concerned that although all of Material Management Group's warehouses throughout the entire theatre were carrying out monthly ten percent (10%) inventories, no significant instances of lost government materials or even damaged materials were being reported from  over seventy (70)  sites.  The pattern of failing to

report losses became such a problem that it ultimately culminated into millions of dollars of lost Government property that Fluor could not and would not explain.

28.     Some of the losses occurred when property was shipped from one Fluor materials warehouse to another.  Strangely, according to Fluor security investigators as well as Fluor transportation and materials personnel, most shipments showed no evidence of being tampered with, which means that Fluor was actually receiving the property from the Government, but then was inexplicably unable to account for it.  One thing that is clear is that Fluor was not properly reporting the missing property.  Additionally, Mackey discovered that property was also missing during the Materials Department's monthly inventories, but Fluor was failing to list it on LTDDs and file the LTDDs, as required by Government regulations.

29.     As 2012 came to a close and the End of Year report came due, Bagram's yearly 100% inventory of assets was completed and the Materials Department was missing in excess of $200,000.00  worth of Government property.  Mackey's property team asked Mackey whether they should submit an LTDD for the assets that the Materials Department could not produce, and Mackey instructed them to move forward with the LTDD process.  Shortly thereafter, Mackey was harshly confronted by his Manager, Jarrold Reeves, regarding the instructions to properly report losses.  Mackey's continued reporting of his concerns during weekly staff meetings and conference calls with the Theatre staff in attendance and with Management in Greenville, Dubai, and Houston on the calls, infuriated Fluor.

30.     On October 30, 2012, Reeves sent Fluor's official End of Year report, to the Government falsely stating that the Materials Department had no losses to report.  But, in reality, there were over nine-hundred (900) line items of materials valued at $791,426.00 that had not been accounted for.  Mackey communicated his concerns to Fluor Materials Leadership including Jarrold Reeves and Tony Montalvo that the report of no losses was false because there

were specific losses that were not included, as well as the $791,426.00 worth of materials that were missing and not available in inventory.  In one e-mail on November 11, 2012, Joshua Waggy ("Waggy"), the Fluor Government Property Supervisor, states in response to Mackey's concern, "what was reported to the DCMA is beyond wrong, all they have to do is simple [sic] read some of the LTDDs to prove that and Fluor will not be sitting good for falsify [sic] their Inventory Reports to the USG."

31.     After the 2012 End of Year report was presented to the Government, the sites began to submit reports of lost Government Property relative to the fiscal year 2012 time frame. These sixteen (16) LTDDs were a direct contradiction to the numbers Fluor presented to the Government, and the collective value was in the millions.

32.     On another occasion in March of 2013, Mackey reported to his management that property lost during shipment from one site to another was likely not being sent in the first place, and inventory accounting tricks were being used to hide the losses.  Rather than investigate the potentially fraudulent activity though, Montalvo instructed Mackey to call him to discuss. During the call, Mackey was threatened and told he could be the subject of a civil action for slander.  This threat was made in order to intimidate Mackey into backing down.

33.     During the April 2013 Sensitive Items Inventory, it was discovered that Minka Hill ("Hill") (a Fluor auditor who worked with Manager Juan Jones) had lost a cellular telephone— a serious breach which would trigger the filing of an LTDD.  In the course of investigating the incident, Mackey discovered that Hill had falsified documents to make it appear that the phone had been present during all of her inventories and also fabricated a document showing the phone had been issued to someone else. Mackey's report to the security department referenced the falsified documents.   Hill became irate, and the pattern of retaliation only intensified.

34.     Mackey was the subject of repeated investigations, allegedly spurred by anonymous calls to the Human Resources Hotline.  None of these investigations turned up evidence of wrongdoing.  The true purpose of the investigations was to ask embarrassing questions about Mackey to his co-workers (including Mercado and Byrd) in order to insinuate false allegations of improper relations with subordinates, incompetence, and favoritism.  This campaign of character assassination was waged in retaliation for Mackey's insistence on filing truthful Government reports, and the purpose was to undermine and intimidate Mackey and his team.

35.     Similarly, Fluor management retaliated against Mackey by denying him the personnel he needed to perform his job.  After Mackey began complaining about the improper reporting scheme, Fluor managers began trying to undermine him in an effort to make him appear incompetent.  For example, at the time Mackey discovered the false reporting, there were three members of his team responsible for reviewing and processing LTDDs (the "LTDD team").  Soon thereafter, Mackey lost two of the three members from the LTDD team and Fluor refused to replace them.  The LTDD team had been comprised of key individuals, including Joshua Waggy– who was responsible for oversight of the LTDDs.  But Fluor managers refused to replace these individuals and left the LTDD team unstaffed and, effectively, inoperative.  Of course, it is no coincidence that just when Mackey discovered problems with the LTDD system, those responsible for the problems (Fluor and senior Fluor managers) took away his ability to detect or correct those problems by effectively eliminating the team responsible for reviewing LTDDs.

36.     This was not the only area where Fluor managers retaliated by understaffing Mackey's command.  As another example, Robert Bunyea ("Bunyea") was the property specialist responsible for maintaining the records at the Personal Protective Equipment

collection.  This was a key position, and Mackey relied on Bunyea.  In a further attempt to undermine Mackey, Fluor management transferred Bunyea (without Mackey's prior knowledge or approval) and replaced him with Minka Hill's husband.  Yet again, the purpose was to undermine Mackey and take away his ability to do his job, in order to make him appear incompetent and force him out.

37.    The level of retaliation is clear when one considers the depth of the understaffing of Mackey's team.  At one time, Mackey had eight team members directly under his control, who he counted on to perform his mission.  Over time, five of those individuals left his employment but were not replaced by Fluor management.  This left Mackey trying to perform his duties with less than half of the team members needed to do the job.

38.    In June of 2013 Mackey's LTDD Senior Specialist, Amir Jetshi ("Jetshi"), informed him that sixteen LTDD reports that they sent to Reeves' office had not been returned and were missing.  When Mackey asked Reeves about the reports, Reeves handed the unsigned LTDDs back to Mackey and informed him that the reports would not be endorsed and that Fluor would roll the LTDDs into an eventual larger LTDD report later.  When Mackey questioned Reeves about the propriety of this plan, Reeves became visibly angry.  Reeves directed Mackey to follow up with Ernest Ridley ("Ridley"), Fluor's LOGCAP Material Manager in Greenville. Ridley flatly denied Reeves' claim and confirmed Mackey's sentiment that the LTDDs should be processed and reported to the Government

39.    The unreported losses continued to pile up and by July 2013 the number of LTDDs that should have been reported to the Government, but were not, comprised property worth tens of millions of taxpayer dollars.  Mackey continued to complain and raise his concerns, but Fluor's leadership continued to ignore this systematic problem and to retaliate against Mackey for raising the issue.

40.     In approximately July/August 2013, responding to Mackey's continued e-mails and notifications, the Country Program Manager, Steve Whitcomb ("Whitcomb"), called a meeting regarding LTDD reporting.  The meeting was attended by Justin Jones and Jeff Nix ("Nix") from Fluor's Audit Compliance Department, Mr. Bryan K. Wilson ("Wilson") of security, Jarrold Reeves, John Loomis ("Loomis") and Mackey from the Materials Management Group, and Whitcomb.  The purpose of the meeting was to investigate allegations that there were problems with LTDD reporting in the Materials Department, specifically the sixteen (16) intentionally suppressed LTDDs.

41.     At the July/August 2013 meeting, Mackey reported that Fluor had over four hundred open LTDDs.  Additionally, the Theatre Security Manager stated that the Materials Department was lying to the Government in its reports, the entire materials program was losing large amounts of materials, and no one was being held responsible.  Reeves attempted to explain away the high number of losses, suggesting they may have been caused by a revision to the LTDD reporting process (as opposed to what he knew to be the truth—that massive amounts of property were continually going missing from his department).

42.     After the meeting, Mackey sent Whitcomb an e-mail informing him that Reeves' explanation about the cause of LTDD generation was not plausible, and that Mackey and his team would be willing to explain the entire process of LTDD initiation and Fluor's systematic cover-up to Whitcomb.  Whitcomb declined Mackey's invitation and also deliberately carbon-copied Reeves in the reply telling the two of them to handle it, thus giving Reeves even more incentive to retaliate against Mackey.

43.     Subsequently, Reeves called a meeting to discuss a new way of reporting loss of Government property.  The "new" method was merely a tactic for delaying timely reporting of lost property though, and was not compliant with Government regulations.  Mackey informed

Reeves that if he was notified of losses, he would notify the Government within seventy-two (72) hours as required by the Government, and would not participate in the cover-up.

44.     Soon thereafter, in late August 2013, Reeves left Afghanistan for a Fluor meeting in Greenville.  Montalvo e-mailed Mackey asking if Mackey intended to take a break, in light of some personal/family circumstances related to the recent death of Mackey's daughter.  Mackey informed Montalvo that he fully intended to remain at work with Fluor in Afghanistan.  Less than two minutes later, Montalvo called Mackey and told him to resign or he would be fired by Reeves upon his return from Greenville.

45.     Rather than be fired, Mackey was coerced by Fluor to draft a resignation letter, stating that he would leave in October 2013.  But, after an appeal to Human Resources, Mackey was told that it appeared he was being retaliated against by Tony Montalvo and therefore his resignation letter was rescinded and he could remain.  Despite this assurance, two days later Reeves informed Mackey that he was being transferred to a new job in a different department—the Organizational Realignment Team.  When he arrived at his purported new job, he was given no training or instructions.  Mackey had been funneled to a team that had no need for him in order to retaliate against him and remove his ability to question and report the serious improprieties in the Materials Department.  Finally, in March 2014, Fluor management completed their retaliation and terminated Mackey when he was placed on the layoff list.

**2. Baldemar Mercado**

46.     Plaintiff Baldemar Mercado is an experienced Government Property Specialist with over twelve years of supervisory experience.  He graduated from Wharton Junior College in Wharton, Texas in 2000 and Apprentice Lineman Technical School in Houston, Texas in 2003.  He is also a long time member of the National Property Management Association ("NPMA").

His practical experience includes expertise in computerized databases for tracking, ordering, receiving and reporting of materials, supplies and shipments.  His Government Property experience includes over seven years at KBR and Fluor Property in Afghanistan and Iraq and ten years of property-related experience on previous state side jobs.

47.     Mercado worked for Fluor in various posts throughout Afghanistan.  In February 2011, Fluor placed Mercado in Bagram, Afghanistan, the largest site in Afghanistan, as Senior Government Property Specialist.  Mercado was tasked with providing oversight of the Property Department in Bagram.

48.     Mercado performed his duties well, as reflected in the excellent Performance Assessment he received for 2011.  Written by his supervisor, Clarence Thomas ("Thomas"), the assessment lauded Mercado's dedication to his work and respect for his role safeguarding Government property.  In fact, Thomas states that, by each and every standard, Mercado exceeds and far exceeds all of Fluor's expectations for his job role, and is "leading the way for the department… [and] some of the practices I, Clarence Thomas, have implemented are adopted from Baldemar's management approach."  Furthermore, Thomas states that Mercado is "truly a man of integrity" and he "ensures constant communication, and transparency of processes among the team."  Mercado's Performance Assessment for 2012, written by a different supervisor, Quentin Jones, was even more glowing, as he received all of the highest marks and was said to "far exceed" all expectations for his role at Fluor, and was a "leading example of excellence." Thomas goes so far as to say Mercado is "one of the most honest and ethical individuals that I have ever met in my life. Period."

49.     Unfortunately, Mercado worked for a company with things to hide, and his honesty and conscientious efforts to follow the law were punished rather than rewarded.  In the course of his employment at Bagram, Mercado began noticing some of the same irregularities in

the Materials Department as those described with regard to Mackey above.  Mercado noted that although the monthly inventories were consistently missing large amounts of property, none of these losses were being reported in LTDD forms, as required.  In fact, the management of Fluor was instructing the Materials Department not to report losses on LTDD forms because they were allegedly still looking for the misplaced property.   Not only was this a violation of the regulations, but the vast majority of the property was never located.

50.     Mercado was troubled by the false reports being issued to the Government, and began requesting proper LTDD documentation.  Citing the federal regulations, he specified in great detail the proper protocol for documenting losses of Government property by Fluor, including the need for documentation of: the facts substantiating any alleged loss of property, the corrective actions to be taken to prevent future losses of property, and the signatures to be obtained for each loss to be processed.  He expressed these concerns, among other places, to his direct supervisor, Juan Jones, in regular meetings of the department.   After Mercado began reporting the irregularities and requesting that the regulations be followed, he was met with an immediate backlash of retaliation that culminated in his demotion then termination from his position.

51.     In February of 2013, Mercado assumed the responsibilities of Property Supervisor when his then-supervisor Clarence Thomas left the position.  As Acting Property Supervisor, Mercado was charged with oversight of around thirty (30) personnel and over one hundred and forty million dollars in the Property books.  But, despite performing all the duties of Property Supervisor, Mercado was never actually promoted to the position, nor did he receive the appropriate pay-grade raise commensurate with his new position.  Mercado served a total of 8 months in this role, but was kept at the pay grade GG11, rather than the appropriate pay grade for a Property Supervisorô GG13.  This amounted to a difference of almost $20,000 per year.

16

52.     When Mercado applied for the promotion to the position he was in fact already filling, he was blackballed by management in retaliation for his refusal to participate in the fraudulent reporting scheme.   It was the custom at Fluor for supervisors to write letters of recommendation for their employees, explaining why they deserved to be promoted.  But, when Mercado applied for the position he was already performing, his supervisor, Juan Jones, refused to write the letter and told Mercado that if he wanted to be promoted he would have to write the letter himself.

53.     Very soon thereafter, in March 2013, Mercado faced his first major challenge as Acting Property Supervisor.   A Government agency, the Defense Contracting Management Agency ("DCMA"), conducts annual audits known as Property Management System Analysis. As Acting Property Supervisor, Mercado had the primary responsibility for ensuring the property management system under his command passed the audit.

54.     Mercado's supervisors scheduled a "Pre-PMSA" beforehand, allegedly to test the system and make sure it would pass the audit.  In fact, his department was targeted and audited by Minka Hill (working closely with Juan Jones and other Fluor managers) with the clear goal of retaliating and making Mercado look incompetent in order to force him out of Fluor.  Hill gave Mercado a poor Pre-PMSA review by sabotaging the findings and deliberately tampering with Assets in Operating Locations on the field, going so far as to scratch off the serial tag of property, then writing up Mercado for having an improper serial tag.  Those Pre-PMSA Internal Audit results would make it all the way up the chain of command to Fluor managers located stateside in Greenville, giving the appearance that Mercado was incompetent and not deserving of promotion.  Tellingly, when the DCMA conducted the actual audit of Mercado's department just two weeks later, it passed with an excellent review.

55.     Another way that Fluor's managers retaliated against Mercado was by chronically understaffing the department he led.   During the time that Mercado was Acting Property Supervisor, his department was allotted thirty-eight employees.   But Fluor management only gave him twenty-seven employees.   Further, the managers moved employees out of Mercado's department, where they were desperately needed, to other departments that were already fully staffed.   This was done to undermine Mercado and make him appear to be incompetent, in an attempt to justify Fluor's adverse employment actions against him.

56.     In September 2013, Fluor management had enough of Mercado's attempts to get the company to follow Federal regulations and properly report losses.   Mercado was relieved from his responsibilities as Acting Property Supervisor and placed in Theatre Property, assisting with Theatre reports.   In this position, Mercado was isolated from the activities going on in Bagram Materials Department, and thus could no longer advocate for proper reporting.   In addition to being a demotion from his prior responsibilities, it was also a job in which there was no possibility for Mercado to be promoted.   Mercado was replaced as Property Supervisor by a lesser qualified personnel with a long history of Human Resources complaints within Fluor who was brought from a much smaller site and handed the position.

57.     In February 2014, despite two consecutive years of excellent reviews and having passed two difficult PMSA audits, Mercado was laid off.   When he asked his supervisor, Juan Jones, why he was being let go, Juan Jones explicitly told Mercado that he was being terminated because he knew too much about Fluor's property problems and accounting issues in the Bagram Materials Department.

58.     Upon losing his position, Mercado immediately applied to other Fluor departments, seeking any employment he could find.   He was offered jobs by two different departments: Air Operations and Transportation.   But, after Mercado was offered these positions,

his previous managers in the Property Department directly intervened and had the offers rescinded.   It was only after Mercado complained to the company Employee Relations Department that he was reinstated to the job with Air Operations, working as an administrator. This job was a huge demotion, from pay grade GG11 down to GG6, with a tremendous reduction in pay.   Worse, Mercado was harassed and belittled by members of his former department, including Minka Hill.  Due to Fluor's systematic retaliation, he lasted only one month in the job, then left Afghanistan and Fluor.

**3. Goldie Byrd**

59.     Plaintiff, Goldie Byrd, began working with Fluor in May 2011 as a Property Specialist tasked with LTDD reporting of Government property.   Byrd's duties in this role included investigations such as obtaining witness statements and documentation, as well as maintaining records and performing Sensitive Items Reports.   Byrd also actively monitored the status of LTDD reports.  Similar to Mercado and Mackey, Byrd excelled in performance reviews at Fluor.

60.     As of 2012, Byrd's supervisors were Clarence Thomas and Baldemar Mercado, and she also worked closely with Rickey Mackey in his role as Property Manager.  As Mackey noticed discrepancies in LTDD reporting procedures, he asked Byrd and Mercado to investigate. When Byrd raised these concerns with the department manager, Juan Jones, he would dismiss her concerns and tell her to file false reports which contained instances of fraud, waste, and abuse.

61.     For example, for the 2012 End of Year Report, there were several LTDDs amounting to hundreds of thousands of dollars of missing and unaccounted for Government

property, with no explanation or proper documentation about the property.  Juan Jones requested that Byrd cover up the reports, but she did not do so.

62.    At this point, Juan Jones told Byrd that according to his superiors, Jarrold Reeves and Scott Dillard ("Dillard"), she was no longer able to open up LTDD reports unless the loss reports were pre-approved by Juan Jones.  As a result, large volumes of lost Government property went unreported as Jones would not approve the filing of a LTDD report.

63.    In January of 2013, after expressing her concerns that the lack of reporting was unethical, Byrd was transferred from working on LTDDs to working on Sensitive Item Inventories.  It was at this time that Minka Hill lost a cell phone, which is a Sensitive Item and would require the filing of an LTDD.  Mackey called a meeting with Hill and Byrd to investigate the facts surrounding the loss.  During the course of a document review, Byrd determined that Hill had falsified a document to show that she had transferred the cell phone to another party as opposed to "losing it" as Hill claimed.  Byrd discovered that Hill didn't even have possession of the phone at the time she allegedly signed it over to an unknown party.  Thus, Hill was caught in a lie and became furious.

64.    In retaliation, Hill abused her auditing authority to make Byrd look inept, requesting on multiple instances that Byrd be terminated and causing Juan Jones to send Byrd harassing e-mails.  Byrd voiced her complaints of the hostile work environment, created by Juan Jones and Hill, to Human Resources.  As it turned out, Human Resources would do nothing but call the supervisors, including Hill and Juan Jones, after such complaints, and accordingly, reporting the problem only made things worse for Byrd.

65.    As further retaliation, members of the department began placing anonymous calls to the Human Resources Hotline, accusing Byrd of inappropriate behavior.  These calls were investigated and determined to be false— every time.  Fluor continued to investigate the baseless

calls, though, even after 8 or 9 instances, interviewing Byrd's co-workers and supervisors. Despite finding that the complaints were baseless, Fluor persisted in the investigations in order to ruin Byrd's reputation, humiliating and harassing her.

66.    Continuing the pattern of retaliation, Juan Jones and Hill even went so far as to call a meeting regarding Sensitive Items procedures in order to go through Byrd's alleged shortcomings in a group setting, causing ridicule and embarrassment.  Hill even had the alleged shortcomings printed up and distributed to each member of the meeting.  But, despite the fact that the instances discussed at the meeting occurred when Byrd was on leave, Jones refused to allow Byrd to speak at the meeting or defend herself and her professional reputation.

67.    To influence Byrd's reporting of Sensitive Items, Byrd was forced to physically move her office across the base and was told by Juan Jones that it was to get her farther away from Mackey.  Byrd was no longer permitted to report Sensitive Items issues to Mackey, and was told to only report to Juan Jones.  The purpose was to prevent Byrd from properly doing her job so the Government would not discover Fluor's failure to report the loss of Government property.

68.    Finally, in February of 2014, Fluor terminated Byrd's employment.  Even this was not the end of the retaliation, though.  It was customary to allow a terminated employee to stay in country a few weeks in order to try to secure a new position, and in fact that opportunity was afforded to other employees who were laid off at the same time as Byrd.  By contrast, Fluor ordered Byrd to immediately pack her belongings and leave the country within seventy-two hours.  Byrd discovered that this order came directly from Scott Dillard, a manager in the Materials Department.  This discriminatory treatment prevented her from obtaining alternative employment.

69.     In February 2014, upon returning from leave, Byrd received an e-mail from Fluor's corporate investigator informing her to immediately report for a meeting.  During this meeting, Byrd was grilled about the LTDD reports and her knowledge of Fluor's fraud, waste, and abuse of Government Property.  Fluor demanded that Byrd immediately gather and turn over all documents in her possession related to these issues.  The next day, after Byrd complied and turned over the documents, Juan Jones instructed Byrd to immediately report to HR where she was told that her position was eliminated and she had seventy-two hours to leave the country. Byrd was confused because she knew that Fluor routinely allowed a terminated employee to stay in country a few weeks in order to try to secure a new position, and that Fluor had done this for other employees laid off at the same time as Fluor eliminated Byrd's position.  Unlike other employees, Byrd was informed that Scott Dillard makes the ultimate decision on how long an employee is allowed to stay in country to secure other employment.  Byrd approached Dillard and asked for an extension to secure other employment, but Dillard unequivocally said no.  On returning directly to her office from HR, Byrd discovered that Fluor had terminated her IT access and locked her out.  Byrd complained to the HR department, but never received a response.

70.     On the third day after her termination, as the seventy-two hour clock ticked down, Byrd arose at 4 a.m. and got in her Fluor issued truck to make final preparations for departure. As Byrd was driving the truck, the center rim suddenly burst and the truck crashed.  Byrd notified her supervisor about the accident, reported that she was injured and experiencing sharp pains in her back, and that she needed medical attention.  An employee from Fluor's safety department met Byrd at the medic's office, took pictures of the truck, and filed a report, which absolved Byrd for any responsibility or fault.  Despite the severe pain in her back, Fluor's medic attributed her pain, not to the accident, but to "adrenaline."

71.     Byrd reported the accident to HR and explained that she needed an extension to stay in country because of the accident, but HR informed Byrd that she was absolutely going to be on a plane out of the country that day.  Byrd, yet again, pleaded with HR to contact Reeves in Fluor management and request an extension for her due to the circumstances.  HR informed Byrd that Reeves declined her request for an extension and, yet again, instructed that she was to be placed on a plane out of the country that day.

72.     Thereafter, Byrd received a call from the medic's office requesting to see her. Byrd reported to the medic's office and, once again, explained that she was in severe pain and was having muscle spasms.  In fact, Byrd had a severe spasm while in the medic's office.  The medic told her that HR had instructed them to put Byrd on a plane out of the country that day.

73.     When Byrd landed in Dubai, her pain had intensified to such an extent that she requested medical attention from the Fluor HR personnel at her hotel.  Byrd was taken to a hospital and underwent two MRI's and several x-rays.  The hospital doctor informed Byrd that the diagnostic tests showed extensive damage to her spinal discs and that he needed to admit her. She informed HR about the doctor's tests and intention to admit her to the hospital, and even offered Fluor to allow her to use her private insurance coverage to cover the costs.

74.     Instead of allowing the doctor to admit her, and with full knowledge of her injuries, Fluor's HR department contacted Bagram HR and instructed them to put her on a plane out of the country that night.  In spite of an MRI performed by Fluor before the accident showing no damage and one immediately after the accident showing spinal damage, unbelievably, Fluor's HR department informed Byrd that if she wasn't on the plane out of country by midnight, she would have to surrender her passport as collateral for the costs of the hospital.   Byrd returned to the USA, and consulted with a neurosurgeon that confirmed her spinal injuries and scheduled her for disc replacement surgery.

75.     Despite medical tests confirming her injuries, her pain, and lack of time to secure a new position in country, Fluor refused to grant her any extra time and insisted that she board the plane, injured or not.  This malicious and vindictive treatment exacerbated Byrd's severe injury and caused her additional pain, suffering, and economic loss.

## IV.
## Cause of Action

**Unlawful Retaliation**
**False Claims Act, 31 U.S.C. § 3730(h)**

76.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 75 of this Complaint.

77.     Under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), it is unlawful for an employer to terminate or otherwise discriminate against an employee in the terms and conditions of employment because the employee engaged in efforts to stop an employer from one or more violations of 31 U.S.C. § 3729.

78.     Plaintiffs engaged in protected activity under the FCA when they refused to participate in Fluor's scheme to cover-up Fluor's systematic and wide-spread losses of Government property and attempts to have Fluor stop this unlawful activity.

79.     Plaintiffs took actions to prevent the false claims from being submitted and their actions constitute protected activity under the FCA.  Plaintiffs, on numerous occasions, requested that their superiors institute corrective actions in connection with the false property inventory reports in violation of FAR Regulations.  Plaintiffs also refused to participate in the concerted scheme of avoiding liability for unexplained and unaccounted for Government property committed by Fluor's management personnel through the use of LTDD reporting to carry out

concealment and misrepresentations.  Fluor knew that Plaintiffs had engaged in these instances of protected activity.

80.     Fluor took adverse personnel actions against Plaintiffs in retaliation for their protected activity, including reducing their employees, excluding them from access to reports, subjecting them to heightened levels of scrutiny, demotion, retaliatory harassment, subjecting them to disparate treatment, isolation, groundless investigations, threats of frivolous legal action, intimidation, and, ultimately, terminating their employment.

81.     Plaintiffs' protected activity was a motivating factor in Fluor's decision to retaliate against them and terminate their employment.

82.     Fluor's actions have caused and will continue to cause Plaintiffs substantial economic loss, including lost salary and benefits, and damage to their career prospects and earnings potential; damage to their professional reputations; humiliation; emotional distress; and pain and suffering.

83.     By these actions, Fluor has violated 31 U.S.C. § 3730(h).

## V.
## Jury Demand

84.     Plaintiffs demand a trial by jury for any and all issues proper to be so tried.

## VI.
## Prayer for Relief

85.     Plaintiffs respectfully request this Court to enter judgment against Defendant as follows:

86.     Award Plaintiffs back pay (plus interest) for lost salary and other benefits of employment of which Defendant's actions have deprived them, and double this amount for violation of the False Claims Act;

25

87.   Reinstate Plaintiffs to their positions with Fluor, or, in the alternative, award them front pay and double this amount for violations of the False Claims Act;

88.   Award Plaintiffs compensatory and special damages in an amount to be determined at trial to compensate them for the harm to professional reputations, and pain, suffering, and emotional distress that Fluor's actions have caused them;

89.   Pre-judgment and post-judgment interest;

90.   Award Plaintiffs' reasonable attorneys' fees and litigation costs; and

91.   Order such other and further relief that the Court deems just and proper.


Respectfully submitted,


By: /s/ Lionel Martin
    Lionel Martin
    Federal ID No. 31342
    Texas State Bar No. 24037032
    Lmartin@mgmartinlaw.com

    10707 Corporate Drive, Suite 100
    Stafford, Texas 77477
    Tel: (281) 277-3066
    Fax: (281) 277-3067

    ***Attorney-In-Charge for Plaintiffs***

**OF COUNSEL:**

**GARCIA-MARTIN & MARTIN, P.C.**

Melissa Garcia-Martin
Federal ID No. 38613
Texas State Bar No. 24039035
mmartin@mgmartinlaw.com

10707 Corporate Drive, Suite 100
Stafford, Texas 77477
Tel:  (281) 277-3066
Fax: (281) 277-3067


**CORRERO & LEISURE, P.C.**

Mark A. Correro
Federal ID No. 566845
Texas State Bar No. 24045702
Mark@CorreroLeisure.com

Lance Leisure
Federal ID No. 566845
Texas State Bar No. 24048616
Lance@CorreroLeisure.com

2909 Hillcroft Avenue, Suite 305
Houston, Texas 77057
Tel: (832) 916-3116
Fax: (888) 508-1293